IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONNA GOLUSZKA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 10241 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| CITY OF COUNTRYSIDE, a municipal corporation, and CHIEF MICHAEL RUTH, both individually and in his capacity as Chief of Police of the Countryside Police Department, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff sues the City of Countryside ("the City") for its alleged violations of the Americans with Disabilities Act ("ADA") and both defendants for retaliating against her for the exercise of her First Amendment rights. The case is before the Court on defendants' Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the Court grants the motion.

## Facts

On April 22, 1992, plaintiff was hired by the City as a desk officer in the police department. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 1.) The duties of a desk officer include answering 911 calls, monitoring radio transmissions from officers in the field, and entering information from callers and officers into a computer database. (*See* Defs.' LR 56.1(a) Stmt., Ex. A, Pl.'s Dep., Ex. A-1-1, Job Description.) For most of her tenure in this position, plaintiff was supervised by defendant Michael Ruth. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 2.)

On February 1, 2010, the City issued a directive that desk officers working the afternoon shift on weekends were required to change computer backup tapes. (*Id.* ¶ 8.) Backup tapes contain everything that is put into the computer, *e.g.*, information about arrests, incidents, tickets and warrants. (*Id.* ¶ 9.) They are changed to ensure that the City maintains these records in the event of a blackout or other catastrophic event. (*Id.* ¶¶ 10-11.) Plaintiff knew that her job responsibilities included changing the backup tapes. (*Id.* ¶ 12.)

On February 18, 2010, plaintiff's doctor sent the City a letter saying that plaintiff was "recovering from a second brain operation" for cancer but wanted to continue to work. (Defs.' LR 56.1(a) Stmt., Ex. B-1-1, Letter from Hannigan to Countryside (Feb. 18, 2010).) The doctor said:

> She has my permission to do so. However, I need to insist that she not be placed on a rotating shift. It is well documented that people who work rotating shifts suffer a variety of illnesses, not the least of which includes poor sleep. The stress of these rotations, however, has also been shown to suppress the immune system and I believe that this puts Mrs. Goluszka at increasing risk. Furthermore, as she is undergoing treatment, she is going to be very fatigued and I do not think she can take the fatigue of both her cancer treatment, as well as the shift rotations.
>
> I understand your department may function around the model of equally shared night and evening rotations. However, I must ask for an exception for my patient.

(*Id.*)

In March 2010, plaintiff was temporarily assigned to light duty, at her request. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6.) On May 3, 2010, when plaintiff's light duty ended, the City notified her that it was granting her request not to work on rotating shifts:

> This is to confirm our April 29th meeting, wherein you were advised that the recent assignment of [light] duties, to accommodate your medical restrictions, has been discontinued pursuant to medical notification that you are able to perform dispatching duties so long as they are NOT assigned on a rotating shift basis. It is our understanding that you can perform regular duties as a "desk officer" so long as they are on a permanent shift basis.

> . . . .
>
> Based on our meeting, you shall be assigned to the a permanent "afternoon" shift and shall be eligible for overtime assignments as with any desk officer. . . .

(Defs.' LR 56.1(a) Stmt., Ex. A, Pl.'s Dep., Ex. A-1-6, Letter from Novak to Pl. (May 3, 2010).)

On August 29, September 18, and September 19, 2010, plaintiff did not change the backup tapes. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 14-15.) Ruth addressed these failures in an email because he was "tr[ying] to change the behavior[,] . . . to ensure that the tapes were changed," rather than disciplining her. (*Id.* ¶ 16; Defs.' LR 56.1(a) Stmt., Ex. B, Ruth Dep. at 49-50.)

In the summer or fall of 2010, plaintiff says she told Ruth that she had been getting migraine headaches since her brain surgeries. (Defs.' LR 56.1(a) Stmt., Ex. A, Pl.'s Dep. at 38-40.) As a result, it was her practice to dim the lights in the Communications Center when she worked. (*Id.* at 37.) Sometime thereafter, clips were put on the light switches so the lights could not be turned entirely off. (*Id.* at 37-38.) Plaintiff admits, however, that she never spoke to Ruth about the lights or the clips. (*Id.* at 43.)

On March 19, and 20, 2011, plaintiff again failed to change the backup tapes. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17.) On March 30, 2011, Ruth issued a written reprimand to plaintiff for her failure to change the tapes on August 9, September 18, and September 19, 2010, and March 19 and 20, 2011. (Defs.' LR 56.1(a) Stmt., Ex. A, Pl.'s Dep., Ex. A-1-7, 3/30/11 Written Reprimand).)

During Ruth's investigation of plaintiff's failure to change the backup tapes, he learned that plaintiff had called the City's outside computer vendor to ask who in the police department could view the status of the backup tapes and from which computers. (*Id.*, Ex. B, Ruth Dep., Ex. B-1-4 Email from Mikel to Ruth (Apr. 4, 2011).) Ruth concluded that the phone call had been an attempt

by plaintiff to interfere with the Department's investigation of her conduct with respect to the backup tapes. (*See id.*, Ex. B, Ruth Dep. Ex. B-1-6, Mem. from Mikel to Ruth (Apr. 12, 2011).) As a result, on April 28, 2011, Ruth gave her a written reprimand for "Unbecoming Conduct." (*Id.*)

On May 2, 2011, plaintiff's union filed a grievance on her behalf over the April 28, 2011 reprimand contending that it was, in essence, a second punishment for her failure to change the tapes in March. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 4 at 504, Grievance.) The grievance was denied. (*See id.*)

On May 29, 2011, plaintiff again failed to change the backup tapes, and was suspended for one day as a result. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22; *see* Defs.' LR 56.1(a) Stmt., Ex. A., Pl.'s Dep. Ex. A-1-9, 8/1/11 Order of Suspension.)

On July 4, 2011, plaintiff developed a severe migraine headache while at work and was hospitalized as a result. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 9.)

On August 31, 2011, plaintiff filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the EEOC alleging that she "requested a reasonable accommodation," which "was not provided" and subsequently was "subjected to discipline and suspension." (Defs.' LR 56.1(a) Stmt., Ex. B, Ruth Dep., Ex. B-1-10, IDHR/EEOC Charge.)

On October 29, 2011, plaintiff failed to change the backup tapes and was suspended for two days as a result. (*See id.*, Ex. A., Pl.'s Dep. Ex. A-1-10, 12/15/11 Order of Suspension; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 25.)

On December 19, 2011, plaintiff's union filed a grievance on her behalf over the two-day suspension, arguing that she had, in fact, changed the tapes. (Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 4 at 527, Grievance.) Apparently, though the record does not so state, the grievance was denied.

4

On February 22, 2012, plaintiff "logg[ed] the incorrect times for an officers [sic] break into the records management system and . . . sent a tow truck to the wrong location." (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 26; *see* Defs.' LR 56.1(a) Stmt., Ex. A, Pl.'s Dep. Ex. A-1-11, 4/3/12 Written Reprimand.) Consequently, on April 3, 2012, Ruth gave her a written reprimand for "gross inattention to duty." (Defs.' LR 56.1(a) Stmt., Ex. A, Pl.'s Dep. Ex. A-1-11, 4/3/12 Written Reprimand.)

On August 2012, plaintiff "failed to obtain proper information from a caller who was requesting the police" and gave "incorrect information to [City] Police Officers responding to a call for service, which led them to the wrong location, resulting in a significant delay in police response." (*See id.*, Pl.'s Dep. Ex. A-1-12, 11/2/12 Order of Suspension.) As a result, Ruth suspended plaintiff for one day for "gross inattention to duty." (*Id.*)

On October 12, 2013, plaintiff was terminated by the City because the dispatching function was moved to a central location. (*Id.* ¶ 32.) Plaintiff could have applied for a job with central dispatch, but did not. (*Id.*) Instead, she and the three other desk officers, Cathy Rothbard, Patricia Littlejohn, and Guadalupe Hamernik, applied for two open positions, one as community service officer supervisor and the other as a records clerk manager. (*Id.* ¶ 33.) Plaintiff and Rothbard were not chosen for either position. (*Id.*)

## **Discussion**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we do not weigh evidence or determine the truth of the matters

asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

In Count I of the first amended complaint, plaintiff alleges that the City disciplined her because of her disability in violation of the ADA. *See* 42 U.S.C. § 12112(a) (prohibiting employers from discriminating against "a qualified individual on the basis of disability"). To defeat the City's motion on this claim, plaintiff relies on the indirect method of proof, which requires her to establish a prima facie case of discrimination by showing that: (1) "[she] was a qualified individual with a disability"; (2) "she was meeting [the City's] legitimate expectations"; (3) "she nevertheless suffered an adverse employment action"; and (4) "similarly situated, non-disabled employees were treated more favorably." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014) (quotation omitted). The City contends that evidence of the second and fourth elements is lacking.

The Court agrees. It is undisputed that plaintiff knew changing the backup tapes was part of her job, that she failed to do so on August 9, September 18, and September 19, 2010, March 19, and 20, May 29, and October 29, 2011, and that she improperly questioned the City's computer vendor about backup tapes. (*Id.* ¶¶ 8, 12-15, 17, 19-20, 25.) It is also undisputed that on February 22, 2012, plaintiff "logg[ed] the incorrect times for an officers [sic] break into the records management system and . . . sent a tow truck to the wrong location," and on August 30, 2012, she obtained the wrong information from a caller and sent responding officers to the wrong location.

6

(*Id.* ¶¶ 26-27.) Thus, the record establishes that plaintiff was not meeting the City's legitimate expectations.

Moreover, even if she had been meeting its expectations, plaintiff offers no evidence that similarly situated employees received more favorable treatment. Two employees are similarly situated if they are "directly comparable . . . in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). In the disciplinary context, this means the employees have engaged in similar misconduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). Plaintiff offers no admissible evidence that any other desk officer failed to change the backup tapes seven times, improperly contacted an outside vendor, logged incorrect break times into the computer, sent a tow truck to the wrong location, failed to obtain proper information from a caller asking for assistance and gave incorrect information to officers responding to the call, as she admittedly did, but was disciplined less harshly or not at all by the City. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt., Ex. 6, Pl.'s Aff. ¶¶ 8-9 (asserting, without any foundation, that desk officer Littlejohn put incorrect information into the computer system on one occasion and desk officer Hamernik sent officers to the wrong location on two occasions, and neither was disciplined) Thus, even if the record suggested that plaintiff was meeting the City's expectations, she still could not make a prima facie case of discrimination on her discipline claim. *See Taylor-Novotny*, 772 F.3d at 492 ("[T]o show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings.") (quotation omitted).

7

Alternatively, plaintiff alleges that the City discriminated against her by failing to hire her for the community service officer supervisor or records clerk manager positions after it centralized the dispatching function. To make a prima facie case for this claim, plaintiff must offer evidence that she is disabled, she applied and was qualified for an open position, and a nondisabled person with similar or lesser qualifications was hired. *Grigsby v. LaHood*, 628 F.3d 354, 358-59 (7th Cir. 2010); (*see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 33-32.) Plaintiff offers no evidence to support the last element. Though she claims that she has "more experience[] and . . . seniority" than successful applicant Littlejohn (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 29), plaintiff offers no evidence about the knowledge, skills, and abilities required for the job, the candidates' relative experience with respect to those knowledge, skills and abilities or whether seniority was or should have been taken into account in the hiring process. Absent such evidence, plaintiff has not satisfied the last element of the prima facie case for her failure-to-hire claim.

Plaintiff fares no better with the prima facie case for her retaliation claim, which requires proof that she "(1) engaged in protected activity; (2) was performing [her] job satisfactorily; and (3) was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601-02 (7th Cir. 2011). Though plaintiff engaged in protected activity by filing an EEOC charge, there is, as discussed above, no dispute that she was not meeting the City's legitimate expectations. Accordingly, her retaliation claim fails.

In Count III of the first amended complaint, plaintiff alleges that the City failed to accommodate her disability by refusing to allow her to dim the lights in the Communications Center when she had migraine headaches. To establish a prima facie case for this claim, "plaintiff must

8

show that: "(1) she is a qualified individual with a disability; (2) the [City] was aware of her disability; and (3) [it] failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747-48 (7th Cir. 2011). The record contains no evidence to support the third element. Though plaintiff said that she dimmed the lights when she had migraines, she also testified that she did not talk to Ruth about the lights or the fact that clips had been put on the switches to prevent the lights from being turned off. (*See* Defs.' LR 56.1(a) Stmt., Ex. A, Pl.'s Dep. at 42-43 (testifying that she "never went to [Ruth] with the clips," "never had a conversation with [Ruth] about the lights," and did not have conversations about the lights with City management). Because plaintiff offers no evidence that the City knew she needed to dim the lights, she has not made a prima facie case of failure to accommodate.

Plaintiff's last claim is that defendants retaliated against her for exercising her First Amendment rights. "To make out a prima facie case of First Amendment retaliation, a public employee must present evidence that (1) [her] speech was constitutionally protected; (2) [s]he has suffered a deprivation likely to deter free speech; and (3) [her] speech was at least a motivating factor in the employer's actions." *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir. 2013) (quotation omitted). Plaintiff's speech is constitutionally protected if she was speaking "'as a citizen on a matter of public concern.'" *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)); *see Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) ("[The] inquiry into the protected status of speech is one of law, not fact."). An employee speaks as a citizen unless she speaks "'pursuant to [her] official duties.'" *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 421). Thus, plaintiff was plainly

acting as a citizen when she engaged in the "speech" at issue here, filing the IDHR/EEOC charge, grievances, and this lawsuit.

It is equally plain, however, that her speech was on a matter of private, not public, concern:

> Our precedent makes clear . . . that speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern . . . . Rather, we must instead delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public. . . . [I]t is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?

*Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999) (quotations and citations omitted); *Marshall v. Porter Cnty. Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994) ("If the speech concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern.") (emphasis in original). Plaintiff's charge, grievances, and lawsuit say nothing about other employees or allege that the City has a pattern or practice of discriminating against disabled employees. Moreover, she offers no evidence to suggest that her complaints were motivated by concern for anything but her own employment situation. Thus, as a matter of law, plaintiff's speech is not on a matter of public concern, and thus is not constitutionally protected. *See Brown v. Ill. Dep't of Pub. Aid*, 318 F. Supp. 2d 696, 699 (N.D. Ill. 2004) (holding that EEOC charges "touched on a private, not public, matter" because they "complain[ed] of discrimination specific to [plaintiff]" not about "systematic discrimination against a class of employees"), *aff'd*, 132 Fed. Appx. 51 (2005).

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact as to plaintiff's claims against defendants, who are entitled to judgment as a matter of law. The Court, therefore, grants defendants' motion for summary judgment [50] and terminates this case.

**SO ORDERED.**                                **ENTERED:   February 18, 2015**

_____
**HON.  JORGE ALONSO**
**United States District Judge**